## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

_____

| | | |
|---|---|---|
| **SCOTT and TINA KIBLER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 11-CV-2094** |
| | ) | |
| **THE UNITED STATES OF AMERICA d/b/a** | ) | |
| **THE ARMY CORPS OF ENGINEERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### OPINION

Plaintiffs, Scott and Tina Kibler, filed this Complaint (#1) pursuant to the Federal Tort Claims Act (28 U.S.C. § 2671, et seq.) alleging negligence and wanton and willful conduct on the part of Defendant, United States of America d/b/a the Army Corps of Engineers, for injuries sustained by Plaintiffs. Defendant filed a Motion for Summary Judgment (#36) on September 30, 2013, arguing that judgment should be entered in its favor based on sovereign immunity under the Flood Control Act of 1928 (33 U.S.C. § 702c) and the discretionary function exception to the Federal Tort Claims Act liability afforded by 28 U.S.C. § 2680(a). Plaintiffs filed their Response (#58) on October 21, 2013, and Defendant filed its Reply (#59) on November 1, 2013. For the following reasons, Defendant's Motion for Summary Judgment (#36) is GRANTED.

### BACKGROUND

<u>Overview</u>

This case concerns an incident that occurred at Lake Shelbyville in Moultrie County, Illinois, at approximately 3 p.m. on July 19, 2009. Plaintiff Scott Kibler and his family went to Lake Shelbyville to go boating. Plaintiffs proceeded to the F.W. "Bo" Woods boat dock at Lake Shelbyville that was owned, operated, and maintained by Defendant. Plaintiffs had to use the

open high water boat ramp to launch their boat onto Lake Shelbyville. After launching the boat, Plaintiff Scott Kibler then attempted to walk down the low water boat ramp to swim over to his boat. Scott stepped onto the low water boat ramp and slipped on the slick ramp, apparently striking his head. Plaintiff Tina Kibler, Scott's wife, motored their boat over to the low boat ramp and saw Scott unconscious on the ramp, with his face below the water line. Scott was eventually rescued and pulled out of the water. Plaintiffs filed suit against Defendant alleging negligence and wanton and willful conduct.

Factual Background[1]

*Defendant's List of Statement of Undisputed Material Facts and Plaintiff's Objections*

Before reciting the factual background of this case, the court must first address which facts are qualified to be "undisputed material facts" suitable for consideration on summary judgment. Defendant's Motion for Summary Judgment contained 201 "undisputed material facts." Each fact was accompanied by extensive citation to the record, whether it be Plaintiff's deposition, the declarations of various employees of the U.S. Army Corps of Engineers, or Army Corps of Engineers policy manuals. In Plaintiffs' Response, Plaintiffs admitted that the following facts from Defendant's list qualify as undisputed material facts: 1-5, 9-22, 23-27, 29, 32, 34-45, 52-58, 61, 71, 72, 75, 78, 79, 81, 82, 88-91, 100-118, 120-125, 127, 130, 136-143, 145-147, 149-151, 153-156, 183-185, 188-191, 194, and 199. These facts are deemed admissible and will be considered for summary judgment purposes. Plaintiffs objected to the remaining facts. Plaintiffs disputed some of the objected-to facts and believed others were

_____

[1]These facts are taken from Defendant's statement of undisputed facts and documents submitted by the parties. This court has only included facts which are adequately supported by evidence in the record.

2

immaterial.  The court must now determine whether those objected-to facts should be admissible at summary judgment.

Local Rule 7.1(D)(1)(b) of the Central District of Illinois states that a motion for summary judgment must include a section labeled "material facts claimed to be undisputed," and that the movant must

"List and number each undisputed material fact which is the basis for the motion for summary judgment.  Include as exhibits to the motion all relevant documentary evidence.  For each fact asserted, provide citations to the documentary evidence that supports it, appropriately referencing the exhibit and page.

 A WORD OF CAUTION: Material facts are only those facts which bear directly on the legal issue raised by the motion."  Local Rule 7.1(D)(1)(b)."

The proper form for responding to the movant's statement of undisputed material facts is similarly spelled out in detail:

"Response to Undisputed Material Facts:

In separate subsections state the following:

(1)     Undisputed material facts:

List by number each fact from Section B of the motion for summary judgment which is conceded to be undisputed and material.

(2)     Disputed Material Facts:

List by number each fact from Section B of the motion for summary judgment which is conceded to be material but claimed to be disputed.

Each claim of disputed fact must be supported by evidentiary documentation referenced by specific page. Include as exhibits all cited documentary evidence not already submitted by movant.

 (3) <u>Disputed Immaterial Facts:</u>

  List by number each fact from Section B of the motion for summary judgment which is claimed to be both immaterial and disputed. State the reason the fact is immaterial. Support the claim that the fact is disputed with evidentiary documentation referenced by specific page. Include as exhibits all cited documentary evidence not already submitted by the movant.

 (4) <u>Undisputed Immaterial Facts:</u>

  List by number each fact from Section B of the motion for summary judgment which is undisputed but is claimed to be immaterial. State the reason the fact is immaterial.

 (5) <u>Additional Material Facts:</u>

  List and number each additional material fact raised in opposition to the motion for summary judgment. Each additional fact must be supported by evidentiary documentation referenced by specific page. Include as exhibits all relevant documentary evidence not already submitted by the movant.

 (6) A failure to respond to any numbered fact will be deemed an admission of the fact." Local Rule 7.1(D)(2)(b).

A party responding and disputing the movant's statement of undisputed material facts must support its own factual allegations with citation to evidence in the record. Factual

allegations not supported by the record are nullities. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). Naked denials are insufficient to controvert an adverse party's properly supported Local Rule 7.1(D)(1)(b) statement of undisputed material fact. See *Robledo v. City of Chicago*, 778 F.Supp.2d 887, 899 (N.D. Ill. 2011). The Seventh Circuit has held that local rules governing summary judgment statements of material fact are to be strictly applied, and any facts asserted by the movant and not contradicted by *in the manner specified by the rule* are deemed admitted. See *Valenti v. Qualex, Inc.*, 970 F.2d 363, 368-69 (7th Cir. 1992) (emphasis added). Further, in reference to the Northern District of Illinois version of the local rule regarding responses to a movant's statement of undisputed material facts on summary judgment, a "responsive statement that is a flat denial, without reference to supporting materials, or with incorrect or improper references, and containing irrelevant additional facts, has no standing under [the local rule]." *Valenti*, 970 F.2d at 369.

Responses must also be specific. "Conclusory allegations by the party opposing the motion cannot defeat the motion[,]" rather "[t]he party opposing the motion must come forward with evidence of a genuine factual dispute." *Hedberg v. Indiana Bell Telephone Company*, 47 F.3d 928, 931 (7th Cir. 1995). Further, unsupported speculation does not meet a party's burden of providing some defense to a summary judgment motion. *Hedberg*, 47 F.3d at 931-32. "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is the primary goal of summary judgment." *Hedberg*, 47 F.3d at 932 (emphasis in original). At summary judgment "saying so doesn't make it so[,]" but rather "summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact[.]" *United States v. 5443 Suffield*

*Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010).

Here, the vast majority of Plaintiffs' responses to Defendant's statement of undisputed material fact are inadequate under the local rule and Seventh Circuit case law. The court will address specifically the facts disputed by Plaintiffs.

Facts 6, 7, 30, 33, 126, 129, 131, 133, 134, 135, 197

These facts are material facts that Plaintiffs have disputed. Plaintiff disputes these facts because, for the most part, they concern Defendant's contentions that the low boat ramp at Bo Wood was closed to the public at the time of Scott's accident and that the closure was amply indicated to the public via warning signs, barricades, and caution tape. Plaintiffs dispute this assertion by citing to Scott Kibler's deposition in the record, where Scott denies that the warning signs and barricades were present at the time of his accident. Plaintiffs also dispute Defendant's assertion that Scott entered the water, citing to Scott's deposition testimony that he approached the water with the intent of going in, but had no recollection from that point forward. Plaintiffs' dispute of these material facts is supported with citation to Scott Kibler's deposition testimony. Therefore, to the extent the court considers Defendant's statement of those facts, the court will also consider Plaintiffs' objections and Scott's testimony.

Facts 28, 31, 46, 47-51, 59, 60, 74, 76-77, 80, 160

These undisputed material facts listed by Defendant are objected to by Plaintiff, but the objections contain no reference to documentary evidence from the record. For example, in response to Defendant's claim that "[a]ll water in Lake Shelbyville above elevation 599.70' is exclusively flood water retained in Lake Shelbyville for flood control purposes," supported by a citation to the Declaration of hydraulic engineer and occasional Acting Chief of Water Control

Operations for the St. Louis District of the Mississippi Valley Division of the U.S. Army Corps of Engineers Russell Errett (Defendant's Exhibit 3), Plaintiffs simply respond in objection:

> "[t]he factual statement that all water above a certain elevation is 'exclusively flood water' is not accurate. It is not possible to determine what water in a lake is flood water versus non-flood water. An accurate factual statement is that the lake is considered to be at flood stage when its elevation is above 599.70'."

Plaintiffs do not cite to evidentiary documentation referenced by specific page to refute the statement in Errett's declaration. A further example is Defendant's fact 46, which states "[e]xcept for the high flood water in Lake Shelbyville exclusively for flood control purposes ***, this primary low water concrete boat ramp at Bo Wood would have been dry concrete on the afternoon of July 19, 2009, instead of being coated with flood water and the extremely slick natural coating of that concrete boat ramp caused by the fluctuating flood water levels on that boat ramp." This fact is supported with reference to the declarations of Errett, U.S. Army Corps of Engineers Operations Project Manager at Lake Shelbyville Ricky Raymond, and Kevin Slattery.

Plaintiffs' objection response simply states:

> "The factual statement that the low water concrete boat ramp would have been dry and free from debris is speculative and not based in fact. Indeed, the lower portion of the low water boat ramp is intended to be submerged in the water at all times, regardless of water elevation."

Again, Plaintiffs do not cite to evidentiary documentation referenced by specific page to

dispute Defendant's material fact. Plaintiffs' responses read more like an argument, or a flat denial that one would find in an answer to a complaint. Plaintiffs have not contradicted Defendant's asserted facts in the manner specified by the local rule, and thus those facts must be deemed admitted. See *Valenti*, 970 F.2d at 368-69. Plaintiffs' flat denials, without reference to supporting materials, have no standing under the local rule. See *Valenti*, 970 F.2d at 369; see also *Sokoya v. Downey*, 2009 WL 773523, *3 (C.D. Ill. Mar. 20, 2009) (the plaintiff's response to the defendant's statement of undisputed material facts stricken in its entirety where the plaintiff is in violation of local rules for, among other reasons, failing to support his "evasive denials" by citation to any portion of the record or additional exhibits); *Karagiannis v. Allcare Dental Management, LLC*, 2011 WL 3273216, *3 (C.D. Ill. Aug. 1, 2011) (noting that the Seventh Circuit has repeatedly upheld the strict enforcement of local rules and has sustained the entry of summary judgment when the non-movant failed to submit a factual statement called for by the pertinent local rule and that, due to the plaintiff's denials not citing any supporting evidence, the plaintiff is found to have conceded the defendant's version of the facts and those facts are deemed admitted). Therefore, the above facts of Defendant are deemed admitted and will be considered by the court in this motion to the extent they are supported by documentary evidence in the record.

Facts 83-87, 92, 98, 99, 119, 148, 152, 159, 162, 163, 176-182, 186-187, 192, 193, 195, 198

All of these facts of Defendant's are disputed by Plaintiffs with the mere assertion that the statements "make[] a legal conclusion and [are] not [] factual statement[s]." Again, Plaintiffs, in violation of the local rule, provide no citation to evidentiary documentation

referenced by a specific page. Such flat, blanket denials, without reference to the supporting materials, have no standing under the local rule. See *Valenti*, 970 F.2d at 369. Such statements are conclusory allegations and not evidence of a genuine factual dispute, and therefore cannot defeat a motion for summary judgment. See *Hedberg*, 47 F.3d at 931. Therefore, the above facts of Defendant are deemed admitted and will be considered by the court in this motion to the extent they are supported by documentary evidence in the record.

Finally, with regard to the undisputed immaterial facts, the court will determine what facts it believes relevant to the issues before it in this case. The court will only consider, in its discretion, those facts that are relevant to the outcome of the instant Motion for Summary Judgment.

Facts of the Case[2]

Lake Shelbyville was constructed to provide flood control for the Kaskaskia and Mississippi Rivers, and for other authorized purposes by placing a dam on the Kaskaskia River which flows into and out of the Lake Shelbyville Reservoir. Lake Shelbyville is a multi-purpose flood control reservoir of the U.S. Army Corps of Engineers, that is part of the flood risk management system of the St. Louis District of the Engineers' Mississippi Valley Division. Flood protection benefits afforded by Lake Shelbyville extend downstream to the Kaskaskia River Basin to that portion of the Mississippi River Basin located between Chester and Cairo, Illinois and also benefits the lands and waters upstream from Lake Shelbyville. Water retained

---

[2]The court notes that Defendant's Statement of Undisputed Material Facts consisted of 201 facts and took up seventy pages of the Motion for Summary Judgment (#36). The court will only recite those facts relevant to the determination of the summary judgment motion and that are supported by proper citation to documentary evidence in the record.

in Lake Shelbyville up to the top of the inactive or minimum pool at 573' has 30,000 acre feet of water storage and is designed for the natural depositing of silt into the lake and has a maximum shoreline of 55 miles. Water retained in Lake Shelbyville beginning at water elevation 573' and continuing up to water elevation 599.70' is the joint use pool with a maximum shoreline of 172 miles with (a) 25,000 acre-feet to be constantly retained to supply water for contract-water users; (b) 155,000 acre-feet for downstream navigational purposes, and the authorized uses of this water within the joint-use pool are for: water supply, low flow regulation, navigation, fish and wildlife regulation, and water pool fluctuation. All water in Lake Shelbyville above elevation 599.70' is exclusively flood water retained in Lake Shelbyville for flood control purposes.

Because of the flood water in Lake Shelbyville, the low water primary boat ramp was closed from May 17, 2009, necessitating the high water boat ramp be open to the public beginning on that date. The flood control pool is that portion of the water in Lake Shelbyville between the end of the joint use pool and beginning of the flood control pool at 599.70' and continuing up to a maximum flood water elevation of 626.5' above mean sea level. All waters in Lake Shelbyville above the top of the joint use pool elevation of 599.70' above mean sea level by definition are flood waters that are stored in Lake Shelbyville for flood control purposes. All water released from the lake when water is in the flood control pool is released for flood control purposes.

As of July 19, 2009, Lake Shelbyville had been in continuous flood stage for 81 days. In Lake Shelbyville, when water elevation reaches 609.5', flood water comes up to the top of the low water primary boat ramp. From May 16 through July 28, 2009, the flood waters were higher than the 609.5' elevation of the top of the ramp. Consequently, at 3:00 pm on July 19, 2009, the

date and time that Scott claims he was injured, the flood waters in the lake, at elevation 611.52',
were 11.82' deep (*i.e.* 611.52 minus 599.70' (top of joint use pool).

On the afternoon of July 19, 2009, Plaintiff Scott Kibler drove his vehicle, trailer, and
boat along with his wife, Tina Kibler, and five minors, to the high water boat ramp at the Forrest
"Bo" Wood Recreation Area at Lake Shelbyville. The Bo Wood Recreation Area did not have a
boat dock and Scott waited in line about thirty minutes to launch his boat on the high water boat
ramp. At that time, no one was using Defendant's nearby low water boat ramp to launch their
boats. From his position on the high water boat ramp Scott could see that the water came all the
way up the primary low water boat ramp. Scott knew a person could not launch a boat on the
primary low water boat ramp that afternoon because the water was so high. After launching his
boat on the high water boat ramp, Scott parked his trailer at the adjacent parking lot around 2:30
pm. He then began walking down the dry upper portion of the primary low water boat ramp with
the intention of initially wading through the flood water on that boat ramp to a sufficient depth to
begin swimming through the remainder of the ramp to his boat. At the time, his boat was being
driven in Lake Shelbyville by Tina, who was waiting for Scott to swim aboard. Scott was
wearing flip flops and a life jacket as he approached the low water primary boat ramp. From that
point forward Scott does not remember any of the events that occurred at Lake Shelbyville.

Tina drove the boat off the high water boat ramp when it was launched, and then during
this time, was motoring the boat with the children over to the primary low water boat ramp with
the intention of picking up Scott after he waded and swam through the low water boat ramp
toward the boat. Tina looked towards the upper portion of the primary low water boat ramp and
saw Scott close to the water on the ramp, with part of his body visible above the water and not

11

completely covered. She saw that Scott was laying face down on the ramp in maybe up to three to four feet of water. Tina at first thought Scott was swimming until she saw the life jacket on the edge of the ramp directly above the edge of the water on dry pavement. Tina then observed unknown persons coming down the primary low water boat ramp to rescue Scott and she saw them falling and sliding before they hit the water. Finally, two of the persons got down on all fours and slid back on all fours to get Scott out of the water. Tina stated that people were slipping and sliding before they got to the water's edge, and then someone crawled to keep from falling to get to the water's edge and dragged Scott out of the water. Defendant claims the ramp was closed to the public and the proper warning signs, caution tape, and barricades were up around the ramp. Scott Kibler, in his deposition, denied seeing any such warnings at the time of his accident.

If the flood waters in Lake Shelbyville had not been there, the concrete low water primary boat ramp would have been dry, and there would not have been any slick materials on that portion of the boat ramp where Scott fell. This water is designated as flood water because it is contained within the flood storage pool of the lake, exclusively beginning immediately above 599.70' and extending upward to at least 625.5', and the water ponding on the relevant portion of the primary low water boat ramp at the time of Scott's accident is also deemed to be flood water because the water above 599.70' overflows the joint use pool boundaries and inundates land that is dry when the water in Lake Shelbyville remains below the flood control stage. Consequently, waters exceeding the maximum 599.70' elevation of the joint use pool at Lake Shelbyville, are flood waters retained in the lake exclusively for flood control purposes. Because the flood waters remained at and above 609.94' at this low water boat ramp from May 17, 2009 through July 26,

2009, these flood waters incrementally coated that portion of the ramp with extremely slick natural substances that remained slick and in place even after the flood waters receded down the ramp. The receding flood waters exposed additional slick material that had been covered by higher flood water elevations.

The ponding of the flood water that covered the low water boat ramp was caused by Defendant's discretionary decision to impound flood water within Lake Shelbyville from May 17, 2009 through and past July 20, 2009, for flood control purposes instead of releasing greater volumes of water through the Lake Shelbyville dam during this time period and thereby increasing the then existing downstream flooding of the Kaskaskia River. Were it not for the flood control function, from May until after July 2009, the water level of the lake could have been maintained at a sufficient level to avoid the flooding of the primary low water boat ramp at Bo Wood, but the end result would have been significant flooding of property along the Kaskaskia River downstream from the Lake Shelbyville dam. Instead, releases at much lower rates were made from Lake Shelbyville during this time period to reduce the ongoing flooding, and this reduced volume of water being released caused the higher impoundment of flood water within the lake. Water was not released from Lake Shelbyville at greater rates than these during these time periods exclusively to lessen the then existing downstream flooding of the Kaskaskia. Consequently, this limited release of water from the lake into the downstream Kaskaskia River in the summer of 2009 for flood control purposes was directly responsible for the increased volume of flood water stored in Lake Shelbyville for flood control purposes, which, during this time period, specifically caused additional ponding of flood water on the low water boat ramp at Bo Wood. This was the flood water that was 11' above the non-flood water elevation of 599.70' on

the ramp and was the only water responsible for depositing the slick residue on the ramp that caused Scott's injuries.

The flood water in Lake Shelbyville that covered the relevant portion of the low water boat ramp and caused the relevant portion of that ramp to become extremely slippery was not mixed with any non-flood water, according to Russell Errett, hydraulic engineer and occasional Acting Chief of Water Control Operations for the Corps' St. Louis District of the Mississippi Valley Division. The strength of the Kaskaskia River's downstream current was a proximate cause of the amount of flood water being retained in Lake Shelbyville and that flood water in Lake Shelbyville was the proximate cause of the slick boat ramp that caused Scott's accident.

From at least May 17, 2009, and continuing past July 26, 2009, all water in Lake Shelbyville was released exclusively for flood control purposes. During this time no water was released from Lake Shelbyville for any commercial purpose because the higher flood water releases more than satisfied the water quality mandated minimum.

The operation of Lake Shelbyville as a flood control project in spring and summer of 2009 increased the probability of injury to Scott, in that the features of the flood control project at that time caused the high level of flood water as well as the extremely slippery condition of the relevant area of the low water boat ramp. This slippery condition stemmed from the features of Lake Shelbyville that differentiate flood control lakes from purely recreational and natural lakes. Unlike Lake Shelbyville, a natural lake does not have an artificial dam allowing for the artificial impoundment and or artificial release of water from the natural lake. The target elevation of a natural lake is slightly below the discharge elevation of the lake, so that even a small increase in water elevation of the lake is naturally discharged over the lake's lowest points

14

along its shoreline, so that the water elevation in a natural lake will not fluctuate more than a couple of feet even during periods of high water entering the lake.  Recreational lakes discharge water at approximately the same rates as the excess volumes of water enter the lake and the discharge structure of a recreational lake is designed so that water is discharged from the lake at approximately the same rate and volume of excess water entering the lake.  By contrast, a flood control lake like Lake Shelbyville has the opposite purpose, as Defendant continuously monitors the balance of retention of excess flood waters within the flood control lake and also monitors the release of water for flood control purposes, with this flood water management resulting in a nearly constant flood water fluctuation in order to provide managed flood control via the flood control lake.

By way of example in the summer of 2009, Lake Shelbyville is in the same general vicinity and received similar amounts of precipitation as recreational lakes Bloomington and Decatur.  Because Lake Bloomington and Lake Decatur are recreational lakes, however, their water levels did not fluctuate more than a couple of feet whereas, because Lake Shelbyville is a flood control lake designed to retain and not immediately discharge water, Lake Shelbyville fluctuated more than 14' throughout the summer.  Because of these differences, the recreational lakes' boat ramps did not become covered with slick residue and slime due to constant cover with flood waters and thus those lakes did not have their low water boat ramps closed, necessitating in the opening of the high water boat ramps.  By contrast, the low water primary boat ramp at Bo Wood was closed due to flood water and had become slick with slippery residue from the flood water.

In sum, if the flood waters had not been on the upper portion of the low water boat ramp,

there would have been no slick materials on the portion of the boat ramp where Scott slipped. These fluctuating flood waters caused the extremely slick condition above and below the flood water line on that boat ramp that Plaintiffs claim caused Scott to fall and caused his permanent injuries. Therefore, without the flood water, there would not have been any water on the relevant portion of the boat ramp, there would not have been any slippery residue on the relevant portion of the boat ramp that afternoon, the relevant portion of the ramp would have been dry, and the ramp and courtesy dock would have been open for public use.

Procedural History

On October 14, 2010, the Tort Claims Division of the U.S. Army Claims Service denied Plaintiffs' claim for injuries sustained by Scott Kibler when he slipped and fell on the pavement of the boat ramp at Lake Shelbyville. On April 13, 2011, Plaintiffs' filed their Complaint (#1) before U.S. District Judge Michael P. McCuskey. The Complaint alleged two counts of negligence against Defendant: one count regarding Scott Kibler and one count regarding Tina Kibler. The Complaint alleged that Defendant had a duty at all times to exercise ordinary care in the maintenance of its boat ramps and the duty to exercise ordinary care to ensure that boaters had a safe means of ingress and egress to their boats on the lake. The Complaint alleged that Defendant: (1) negligently and carelessly failed to safely maintain the facility for its intended use; (2) negligently and carelessly failed to properly maintain the boat ramps in conjunction with the purpose for which the facility was open; (3) negligently and carelessly failed to warn boaters of the extremely slippery surface; (4) provided inadequate or no signage that the low water boat ramp was closed; (5) provided inadequate or no barricades indicating the low water boat ramp was closed; (6) failed to prohibit unloading by all persons when other, safer available means of

unloading and boarding were available on the lake; (7) failed to provide a safe means of entering

on to launched boats from the high water boat ramp; and (8) failed to close all boat entryways at

the location of the accident at times there was no safe means for users to enter onto launched

boats.  The Complaint alleged that Scott has incurred medical expenses, suffered a loss of normal

life, financial loss, and incurred pain and suffering.  Tina alleged damage by loss of consortium

as a result of Scott's injuries, including loss of his companionship, services, and marital

relationship.

Plaintiffs' Complaint also contained two counts alleging willful and wanton conduct

against Defendant.  The willful and wanton allegations alleged Defendant: (1) had knowledge

that the water level in Lake Shelbyville was high and that the low water boat ramp was closed,

and did not provide a safe means of ingress and egress for boaters; (2) should have closed the

high water ramp as they knew there was no safe method of ingress and egress; (3) with conscious

disregard for the safety of the public, had actual knowledge that boaters were using the low

water boat ramp to boat their boats and thus should have provided docks; (4) with conscious

disregard for the safety of the public, had constructive knowledge that boaters were using the

low water boat ramp to board their boats and should have provided docks; (5) failed to prohibit

unloading by all persons when other, safer available means of unloading and boarding were

available on the Lake; and (6) failed to warn Plaintiffs of the danger they were aware of.

Discovery was completed in this case on July 31, 2013.  On September 30, 2013,

Defendant filed its Motion for Summary Judgment (#36).  Plaintiffs' filed their Response (#58)

on October 21, 2013, to which Defendant filed its Reply (#59) on November 1, 2013.  On

December 11, 2013, the case was transferred to this court for all further proceedings.  The case is

now fully briefed and ready for judgment.

ANALYSIS

Defendant argues that it is entitled to summary judgment on Plaintiffs' negligence claims because (1) of the sovereign immunity afford it by the Flood Control Act and (2) the discretionary function exception to Federal Tort Claims Act liability. Defendant further argues that it is entitled to judgment on the pleadings and dismissal for failure to state a cause of action on Plaintiffs' willful and wanton allegations. Defendant's claims will be addressed in turn, starting with the willful and wanton allegations.

*Plaintiffs' Willful and Wanton Claims*

Defendant first moves for a judgment on the pleadings via affirmative defenses pursuant to Federal Rule of Civil Procedure 12(c) with regard to Plaintiffs' willful and wanton counts, as well as a motion under Rule 12(b)(6) for failure to state a valid cause of action. Pursuant to Rule 12(c), Defendant argues that, under the affirmative defenses of sovereign immunity from the Flood Control Act and the discretionary function exception to the Federal Tort Claims Act, Plaintiffs' claims must fail. Defendant further argues that Plaintiffs have failed to state a claim under Rule 12(b)(6). Defendant notes that Plaintiffs safely used and exited the high water boat ramp and that Defendant had no duty to provide a high water dock at every open high water boat ramp at Lake Shelbyville. The Seventh Circuit has noted that Illinois has various definitions for what constitutes willful and wanton conduct. *Fagocki v. Algonquin/Lake-In-The-Hills Fire Protection District*, 496 F.3d 623, 627 (7th Cir. 2007), citing *Burke v. 12 Rothschild's Liquor Mart Inc.*, 593 N.E.2d 522, 530-31 (Ill. 1992) (willful and wanton misconduct approaches the degree of blame attached to intentional harm, since the defendant deliberately inflicts a highly

18

unreasonable risk of harm upon others in conscious disregard of it); *Ziarko v. Soo Line R.R.*, 641 N.E.2d 402, 406 (Ill. 1994) (willful and wanton may be synonymous with gross negligence and under the facts of one case willful and wanton conduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing). Defendant argues that, no matter the definition of willful and wanton is applied in this case, neither the facts nor the Complaint "come close to even supporting a cause of action for willful and wanton misconduct***" Plaintiffs failed to respond to Defendant's arguments in their Response (#58).

Under Seventh Circuit case law motions for judgment on the pleadings pursuant Rule 12(c) and motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) "are governed by the same standards[.]" *Adams v. City of Indianapolis*, — F.3d —, 2014 WL 406772 (7th Cir. Feb. 4, 2014). To survive a motion to dismiss, the complaint need only contain sufficient factual allegations to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this standard, the allegations in the complaint must be, one, detailed enough to "give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests,'" and, two, "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level[.]'" *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007), quoting *Twombly*, 550 U.S. at 554-55 (alteration omitted).

In considering a motion to dismiss for failure to state a claim, the court is limited to the allegations in the pleadings. See *Citadel Group Ltd. v. Washington Regional Medical Center*, 692 F.3d 580, 591 (7th Cir. 2012). The court must evaluate the complaint in the light most

favorable to the plaintiff, accepting as true all well-pleaded factual allegations and drawing all reasonable inferences in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). Importantly, however, the court does not accept as true mere legal conclusions, unsupported by factual allegations, or "[t]hreadbare recitals of the elements of a cause of action[.]" *Iqbal*, 556 U.S. at 678.

Defendant argues that the affirmative defenses cited in its Answer entitle it to judgment on the pleadings. Defendant has also argued that, under any Illinois definition of wanton and willful misconduct, Plaintiffs' claims and the facts alleged in the Complaint fail to state a valid cause of action. Plaintiffs did not respond Defendant's arguments on the wanton and willful claim. The failure of Plaintiffs to offer any opposition to Defendant's affirmative defense under 12(c) or failure to state a claim argument permits an inference of acquiescence and constitutes a waiver. See *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (affirming the district court's determination that the plaintiffs' failure to offer any opposition to the defendant's Rule 12(c) motion constituted a waiver entitling defendant to judgment on the pleadings). Further, it is not this court's job to sift through the record and make Plaintiffs' case for them. See *5443 Suffield Terrace*, 607 F.3d at 511. Because Plaintiffs' have not specifically responded to Defendant's argument on the wanton and willful counts, the court infers that Plaintiffs' have acquiesced in Defendant's arguments and waive their opposition to them. See *Wojtas*, 477 F.3d at 926. Thus, the court GRANTS Defendant's motions under Rules 12(c) and 12(b)(6) and Counts III and IV of Plaintiffs' Complaint are dismissed.

*Plaintiffs' Negligence Claims*

Defendant argues it is entitled to summary judgment on Plaintiffs' negligence claims

(Counts I and II of the Complaint) because it has sovereign immunity under the Flood Control Act and because the discretionary function exception to the Federal Torts Claims Act applies to bar Plaintiffs' action. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson*

*v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

The court will first address Defendant's argument that it is entitled to sovereign immunity pursuant to the Flood Control Act of 1928. Defendant argues that: (1) flood water was in Lake Shelbyville from April 30, 2009 until after July 26, 2009; (2) fluctuating flood water and slick flood water residue in Lake Shelbyville due to flood control caused Scott's alleged injuries; and (3), under relevant U.S. Supreme Court case law, flood control immunity attaches because Scott's alleged damages were caused by flood water and flood water residue. Plaintiffs oppose Defendant's claims, arguing that: (1) Scott was not injured by the release of flood waters, but rather by Defendant's failure to provide safe facilities for its recreational visitors and that (2) Defendant's activities at Lake Shelbyville did not act to make Scott's injuries more or less likely and thus is not the kind of harm contemplated by the Flood Control Act.

The Flood Control Act "was the Nation's response to the disastrous flood in the Mississippi River Valley in 1927 [] [t]hat resulted in the loss of nearly 200 lives and more than $200 million in property damage[.]" *United States v. James*, 478 U.S. 597, 606 (1986), abrogated by *Central Green Co. v. United States*, 531 U.S. 425 (2001). "The flood control system in the Mississippi River Valley in response to this catastrophe was the largest public works project undertaken up to that time in the United States." *James*, 478 U.S. at 606. Incident to the authorization for the project, Congress enacted an immunity provision, which stated that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by

floods or flood waters at any place[.]" 33 U.S.C. § 702c; *Central Green*, 531 U.S. at 426.  In

*James*, the U.S. Supreme Court found that legislative history of the immunity provision

demonstrated that "the sweeping language of § 702c was no drafting inadvertence" and that

"Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the

Government from 'any' liability associated with flood control." *James*, 478 U.S. at 608.  The

Court in *James* concluded that § 702c's language "'safeguarded the United States against

liability of any kind for damage from or by floods or flood waters in the broadest and most

emphatic language.'" *James*, 478 U.S. at 608, quoting *National Manufacturing Co. v. United

States*, 210 F.2d 263, 270 (8th Cir. 1954).  The Court also determined that "[i]t is thus clear from

§ 702c's plain language that the terms 'flood' and 'flood waters' apply to all waters contained in

or carried through a federal flood control project for purposes of or related to flood control, as

well as to waters that such projects cannot control." *James*, 478 U.S. at 605.

In the years following its issuance, the various federal appellate courts applied the

holding in *James* to cases involving the immunity provision of the Act.  In *Kennedy v. Texas

Utilities*, 179 F.3d 258 (5th Cir. 1999), the plaintiff was injured when she stepped on a live

electrical cable at a park located on land purchased by the government for flood control and

other purposes.  On the day of the plaintiff's injury, the lake was one foot below the level

necessary for the lake to be designated as a flood storage pool.  The electrical line on which the

plaintiff injured herself was sometimes submerged by the lake.  The plaintiff stepped on the line

after either going for a swim, or wading or submerging herself in water.  The line was not

installed by the government and was not used in connection with flood control.  The injury did

occur on land purchased by the government for flood control, water storage, and recreational

purposes and which was sometimes covered with flood water.

The Fifth Circuit noted that "[i]n *James*, the Court held that the terms 'flood' and 'flood waters' 'apply to all *waters* contained in or carried through a federal flood control project *for purposes of or related to flood control.*'" *Kennedy*, 179 F.3d at 262 (emphasis in original). Based on *James*, the court found that all the waters in the lake at issue might constitute "flood waters," whether or not the lake was at flood stage, but that the plaintiff's injuries were not "from or by" such flood waters. *Kennedy*, 179 F.3d at 263. The court concluded that the plaintiff's injuries "were caused by an electrical cable which was not installed or maintained by the United States, and which served no flood control purpose whatsoever[]" and that "the only relation to 'flood waters' is that [the plaintiff] would not have gone to the park but for the existence of the lake, and that her injury occurred on a patch of land that is within the flood stage pool" and thus the nexus with flood waters was "too attenuated" to hold that the plaintiff suffered "damage from or by" such waters under § 702c. *Kennedy*, 179 F.3d at 263.

One of the cases cited by the Fifth Circuit in *Kennedy* as distinguishable from the facts before it, was the Seventh Circuit's decision in *Fryman v. United States*, 901 F.2d 79 (7th Cir. 1990). In *Fryman*, the plaintiff and his brother were swimming in Lake Shelbyville near an island in the lake created as part of a flood-control project and later put to recreational use. The island in questioned was submerged when lake water levels were high, but when the island is unsubmerged it was a popular recreational site. The plaintiff broke his neck diving off the island into the water. The plaintiff accused the Army Corps of Engineers of negligence in not posting warning signs or closing the island to recreation.

Citing *James*, the Seventh Circuit found "every drop of water in Lake Shelbyville" to be

"'flood water' within the meaning of § 702c, and [that] the statute block[ed] recovery if the injury [was] 'damage from or by' these waters." *Fryman*, 901 F.2d at 80. The court cautioned, however, that *James* was so broadly written it could not be applied literally and that § 702c is irrelevant to some injuries within the boundaries of a project when the injury is "wholly unrelated" to flood control. *Fryman*, 901 F.2d at 81. The court found that an accident was "'wholly unrelated' to flood control only when the existence of the project does not increase [the accident's] probability." *Fryman*, 901 F.2d at 82. Thus, simple drownings would be encompassed by § 702c because, but for the project, there would be no water, and but for water no one would swim and drown. *Fryman*, 901 F.2d at 82. The court concluded that § 702c applied to the plaintiff's injuries because the Corps' flood-control activities increased the probability of injuries such as plaintiff's and the problem causing the injury was "attributable in substantial part to the nature of the flood-control project," as "a claim based on the theory that the Corps of Engineers should have closed the island to swimming in order to protect recreational users is the same in principal as the claim that the Corps should have closed to boaters the lake in *James*." *Fryman*, 901 F.2d at 82.

A similar conclusion was reached by the Eighth Circuit in *Fisher v. United States*, 31 F.3d 683 (8th Cir. 1994). In *Fisher*, the plaintiff was injured when diving into a shallow recreational area at reservoir owned and operated by the Army Corps of Engineers. The Eighth Circuit noted that 702c's immunity was not absolute and that it applied only when "governmental control of flood waters was a substantial factor in causing the plaintiff's injuries." *Fisher*, 31 F.3d at 684. The court concluded:

> "Section 702c immunity does not depend on the location of the plaintiff at

the time of the injury, but instead turns on whether governmental control of flood

waters was a substantial factor in causing the injury. [citations omitted]

***[The plaintiff] was injured when he dove into shallow water at a

federal flood control project.  The shallow level of water was a result of the

Corps' operation of the Reservoir for flood control.  Thus, governmental control

of flood waters was a substantial factor in causing [the plaintiff's] injuries and the

government is immune from liability under section 702c." *Fisher*, 31 F.3d at 685.

The basis for application of § 702c immunity established in *James* was revisited by the

Supreme Court in *Central Green*.  In that case, the Court was asked to determine the meaning of

the term "floods or flood waters" as contained in § 702c, and "whether those words encompass

all the water that flows through a federal facility that was designed and is operated, at least in

part, for flood control purposes."  *Central Green*, 531 U.S. at 427.  The petitioner in *Central

Green* owned 1,000 acres of pistachio orchards that had been flooded by waters from the Madera

Canal, a federal facility maintained primarily for irrigation purposes.  The lower courts held that

the United States was immune from suit, even though the true purpose of the facility that caused

the damage was irrigation, solely because the Madera Canal was part of the Central Valley

Project, and therefore tenuously related to flood control.  *Central Green*, 531 U.S. at 427-28;

*California v. United States*, 271 F.3d 1377, 1384 (Fed. Cir. 2001) (summarizing factual

background of *Central Green*).

The Court noted that the phrase "related to flood control" generated conflicting opinions

among the courts of appeals.  *Central Green*, 531 U.S. at 430.  The Court found the phrase to be

"unquestionably dictum" because it was not essential to the disposition of any of the issues

contested in *James*. *Central Green*, 531 U.S. at 431. After analyzing the history and purpose of the Central Valley Project, the Court found that "to characterize every drop of water that flows through that immense project as 'flood water' simply because flood control is among the purposes served by the project unnecessarily dilutes the language of the statute." *Central Green*, 531 U.S. at 434. Noting the text of the Act does not include the words "flood control project," but rather stated that immunity attached to "any damage from or by floods or flood waters[,]" the Court held:

> "***the text of the statute directs us to determine the scope of the immunity conferred, not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage and the purposes behind their release." *Central Green*, 531 U.S. at 434.

The Court noted that the *Central Green* case raised a difficult issue because the property damage was allegedly caused by continuous or repeated flows occurring over a period of years, rather than by a single, discrete incident in which it would be "relatively easy to determine that a particular release of water that has reached flood stage is 'flood water,' as in *James*, or that a release directed by a power company for the commercial purpose of generating electricity is not, as in *Henderson v. United States*, 965 F.2d 1488 (8th Cir. 1992)." *Central Green*, 531 U.S. at 436. The court continued that "[i]t is, however, not such a simple matter when damage may have been caused over a period of time in part by flood waters and in part by the routine use of the canal when it contained little more than a trickle." *Central Green*, 531 U.S. at 436. The court concluded that "***in determining whether § 702c immunity attaches, courts should consider the character of the waters that cause the relevant damage rather than the relation

between that damage and a flood control project." *Central Green*, 531 U.S. at 437.

The Court's decision in *Central Green* was recently interpreted and applied by the Fifth Circuit Court of Appeals in *In re Katrina Canal Breaches Litigation*, 696 F.3d 436 (5th Cir. 2012). These cases arose out of Louisiana residents bringing suit against the federal government for flooding damages incurred in the aftermath of Hurricane Katrina in 2005. Many of the claims related to the Mississippi River Gulf Outlet (MRGO), a shipping channel between New Orleans and the Gulf of Mexico. Decades before Katrina, the Army Corps of Engineers dredged MRGO and levees alongside the channel and around the city. When Hurricane Katrina struck, MRGO's size and configuration greatly aggravated the storm's effect on the city and its environs. In considering the claims and their relation to MRGO, the Fifth Circuit stated:

> "Under the *Central Green-Graci*[3] test, the government enjoys immunity only from damages caused by floodwaters released on account of flood control activity or negligence therein. Some Katrina-related flooding was caused not by flood-control activity (or negligence therein) but by MRGO, a navigational channel whose design, construction, and maintenance cannot be characterized as flood-control activity. Therefore, the FCA [Flood Control Act] does not immunize the government against liability for that flooding." *Katrina*, 696 F.3d at 444.

The Fifth Circuit discussed *Central Green*'s holding that "[w]aters that constitute 'floods or flood waters' within the meaning of Section 702c [] are not all waters that pass through a federal flood-control project, but are instead waters of a certain 'character[]'" and that

---

[3]*Graci v. United States*, 456 F.2d 20 (5th Cir. 1971).

"determining whether the water that caused the damage had this immune 'character' has become the heart of the Section 702c inquiry." *Katrina*, 696 F.3d at 445. The court compared the factual situations in *James* (where the Corps opened gates in flood-control projects to release water from reservoirs that had reached flood stage as part of the flood-control project function and *Central Green* determined the water was flood waters) and *Henderson* (where the plaintiff was injured when the Corps opened the gates in flood-control project to produce hydroelectric power and *Central Green* determined the water was not flood water) and found that:

> "The only factual difference between *James* and *Henderson* is that in *James*, the Corps acted to control a flood, whereas in *Henderson*, its activity was entirely unrelated to flood control. Thus, after *Central Green*, waters have the immune character of 'flood waters' if the government's link to the waters is through flood-control activity. That is to say, the government's acting upon waters for the purpose of flood control is flood-control activity, and flood-control activity is what gives waters an immune 'character.' ***the United States enjoys immunity under that section only where damages result from waters released by flood-control activity or negligence therein." *Katrina*, 696 F.3d at 446.

The court would recognize immunity for any flood-control activity engaged in by the government, even in the context of a project that was not primarily or substantially related to flood control. *Katrina*, 696 F.3d at 447. Applying this standard to the cases before it, the Fifth Circuit found that immunity did not apply for MRGO's role in breaching the Reach 2 levee because the dredging of MRGO was not a flood control activity, nor was MRGO so interconnected with the Lake Pontchartrain and Vicinity Hurricane Protection Plan (LPV- a

flood control project) as to make it a part of the LPV and that, therefore, the flood waters that

destroyed those particular plaintiffs' property were not released by any flood control activity or

negligence therein.  *Katrina*, 696 F.3d at 448.  However, § 702c immunity would apply to the

plaintiffs harmed by the breaching of the levees along 17th Street, London Avenue, and Orleans

Avenue Canal caused by the negligent dredging of the 17th Street Canal and the levees' negligent

construction, because the levees were constructed as part of the LPV and the canals themselves

were incorporated by Congress into the overall LPV project, and because those canals were

designed to prevent flooding and were fully incorporated into the LPV, a flood control project,

their design and dredging were flood control activities entitling the government to immunity

under 702c.  *Katrina*, 696 F.3d at 448.

In the instant case, the undisputed material facts, as contained in Defendant's Motion for

Summary Judgment and the various declarations of Army of Corps of Engineers' employees

upon which those facts are based, demonstrate that Plaintiff Scott Kibler's injuries occurred as a

direct result of flood waters being kept in Lake Shelbyville for flood control purposes, and thus §

702c immunity would apply.  See *Central Green*, 531 U.S. at 437; *Katrina*, 696 F.3d at 446.

First, Lake Shelbyville was constructed for flood control purposes.  It was constructed as a

multi-purpose flood control reservoir by Defendant Army Corps of Engineers as part of the flood

risk management system of the St. Louis District of the Engineers' Mississippi Valley Division.

Second, there were flood waters being kept in Lake Shelbyville.  All water in the lake

above elevation 599.70' is exclusively flood water retained in the lake exclusively for flood

control purposes.  All water released from the lake when water is in the flood control pool is

released for flood control purposes.  The flood control pool is that portion of the water in the

lake between the end of the joint use pool at 599.70' and continuing up to the maximum flood

water elevation of 626.5' above mean sea level. As of July 19, 2009, the date of Scott's accident,

Lake Shelbyville had been in continuous flood stage for 81 days. When water reaches 609.5',

flood water comes up to the top of the low water primary boat ramp and, from May 16 through

July 28, 2009, the flood waters were higher than the 609.5' elevation of the ramp. At the time of

Scott's injury, roughly 3:00 pm on July 19, the flood waters in the lake, at elevation 611.52',

were 11.82' deep. Therefore, at the time of the injury, there were flood waters in Lake

Shelbyville.

Further, those waters were being kept in Lake Shelbyville for flood control purposes.

Defendant made a discretionary decision to impound flood water within Lake Shelbyville from

May 17 through July 20, 2009, for flood control purposes instead of releasing greater volumes of

water through the Lake Shelbyville dam during this time period and thereby increasing the then

existing downstream flooding of the Kaskaskia River. Were it not for the flood control function

during the summer of 2009, the water level of the lake could have been maintained at a sufficient

level to prevent flooding of the low water primary boat ramp, but the consequence would have

been significant flooding of the property along the Kaskaskia River downstream from the Lake

Shelbyville. Instead, releases at much lower rates were made from the lake at this time to reduce

the ongoing flooding, causing higher impoundment of flood water within the lake.

Consequently, this limited release of water from the lake into the downstream Kaskaskia River in

the summer of 2009 for flood control purposes was directly responsible for the increased volume

of flood water stored in Lake Shelbyville for flood control purposes, which, during this time

period, specifically caused additional ponding of flood water on the low water boat ramp at Bo

Wood.

Therefore, the facts establish that the waters in Lake Shelbyville above 599.70' on July 19, 2009 are flood waters due to the government's acting upon those waters for the purpose of flood control and thus Defendant is engaged in flood-control activity. See *Katrina*, 696 F.3d at 446. Thus, Defendant will only enjoy immunity under § 702c if Scott's damages resulted from those flood waters. See *Central Green*, 531 U.S. at 437.

Scott testified at his deposition that, after launching his boat off the high water boat ramp at Bo Wood in Lake Shelbyville on the afternoon of July 19, 2009, he began walking down the dry portion of the primary low water boat ramp with the intention of initially wading through the flood water on that ramp to a sufficient depth to swim through the rest of the ramp to his boat. Scott does not remember slipping on the ramp, but Tina saw him a few moments later lying face down in up to three feet of water. As people attempted to rescue Scott, Tina saw them slipping, sliding, and falling as they attempted to run down the primary low water boat ramp. The record evidence demonstrates, and Plaintiffs' Complaint (#1) at paragraph 13(c) alleges, that Scott's injuries occurred because of the extremely slippery surface of the low water primary boat ramp.

The court must now determine whether the slippery surface which caused Scott's injuries was a direct result of flood waters maintained in the lake for flood control purposes. In Lake Shelbyville, when water elevation reaches 609.5', flood water comes up to the top of the low water boat ramp. From May 16 through July 28, 2009, the flood waters were higher than the 609.5' elevation of the top of the ramp. These flood waters incrementally coated that portion of the ramp with extremely slick natural substances that remained slick and in place even after the flood waters receded down the ramp. The receding flood waters exposed additional slick

material that had been covered by higher flood water elevations.  Further, according to Acting Chief of Water Control Operations Russell Errett, the flood water covering that portion of the low water boat ramp causing it to become slick and slippery was not mixed with any non-flood water.  This was the only water responsible for depositing the slick residue on the ramp that caused Scott's injuries.  Thus, the slippery surface that caused Scott's injury on the low water boat ramp was directly caused by the flood waters in Lake Shelbyville.

Based on the above evidence of record, the court finds the following: the water in Lake Shelbyville during the summer of 2009 above 599.70' was flood water being maintained in the lake by Defendant for flood control purposes, and this flood water coated the low water primary boat ramp with the slick and extremely slippery substances that caused Scott's injury.  Therefore, the court finds that § 702c immunity applies because Scott's damages were caused by flood waters, that is waters being maintained in Lake Shelbyville by Defendant for flood control purposes.  See *Central Green*, 531 U.S. at 437.

Plaintiffs argue that, unlike in *Central Green* or *James*, Scott was not injured by the release of floodwaters, but rather by Defendant's "failure to provide safe facilities for its recreational visitors."  In support, Plaintiffs cite to the Seventh Circuit's pre-*Central Green* decision in *Fryman*, which held that § 702c immunity is irrelevant to some injuries within the boundary of a flood control project when the injury is wholly unrelated to flood control where the existence of the project did not increase the injuries' probability.  Thus, in this case, Plaintiffs argue, § 702c does not apply because the probability of Scott's injury was not increased by Defendant's flood control activities compared with a natural lake devoted to recreational use.  The fact that concrete or other surfaces covered with water could become slick due to the natural

accumulation of algae or silt is not unique to lakes that have dual flood control and recreational purposes, thus Plaintiffs' argue that Defendant's flood control activities at Lake Shelbyville did not act to make Scott's injury more or less likely and is not the kind of harm contemplated by the Flood Control Act.

The court finds Plaintiffs' arguments unpersuasive. First, the court has determined, based on the undisputed material facts, that Scott's injury was caused by flood waters. Were it not for the flood control function of Lake Shelbyville, and Defendant's acting upon that flood control function to avoid flooding downstream of the Kaskaskia River, there would not have been the flood waters in Lake Shelbyville so as to coat the low water primary boat ramp with the slick and slippery substance that caused Scott's injury. Scott was injured as a result of flood waters in Lake Shelbyville for flood control purposes, and thus § 702c immunity should apply. See *Central Green*, 531 U.S. at 437.

Further, as to Plaintiffs' argument that Scott's chance of injury was not increased by Defendant's flood control activities compared with a natural lake devoted to recreational use, it must be noted that Plaintiffs make such an argument without support and citation to any evidence or documentation in the record. At summary judgment "saying so doesn't make it so[,]" but rather "summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact[.]" *5443 Suffield Terrace*, 607 F.3d at 510. Also, such an argument relies on the nature of the project or lake (*James*), as opposed to the character of the water (*Central Green*). However, to the extent such an analysis is still viable, the court agrees with Defendant's assertion in their Reply that Lake Shelbyville's flood control features made Scott's injury more likely to occur than on a

recreational or natural lake. Recreational and natural lakes in the area in summer 2009 did not have their water levels fluctuate more than a couple of feet due to their purpose and function being to limit as much as practicable the water level from fluctuating from the ideal recreational target level.  In contrast, Lake Shelbyville, as a flood control lake, had greatly fluctuating water levels in the lake in summer 2009 due to its design to retain and not immediately discharge flood water.  Thus, Lake Shelbyville had higher levels of flood water, causing its boat ramps to be closed due to slick and slippery substances deposited by resting flood waters on the ramps, whereas boat ramps at natural and recreational lakes were not covered by slick substances deposited by flood ramps and could remain open.   Therefore, Scott's injury was more likely to occur at Lake Shelbyville due to the lake's flood control purpose and operation and, thus, if such an analysis is still viable after *Central Green*, § 702c immunity would apply because Scott's accident would be related to flood control and the existence of the project would increase the accident's probability of occurring.  See *Fryman*, 901 F.2d at 81-82.

The court finds instructive the Southern District of Florida's decision in *Bierer-Carter v. United States*, 806 F.Supp.2d 1245 (S.D. Fla. 2011).  In *Bierer-Carter*, the plaintiff sued the government seeking to recover damages for a boater's death, allegedly as a result of the government's negligence and failure to warn of the dangers caused by a water flow regulating structure that created unsafe currents in a lake.  The government built "Structure 68" at the outlet of Lake Istokpoga in Florida to regulate the flow of water.  When the gate of Structure 68 was lifted, water would discharge from the lake into the canal, the rate of water flow varying based on the height of the vertical gate lift and the water level.  On the day in question, the vertical gate lifts on Structure 68 were open and the rate of water flow caused a potentially unsafe current for

boaters.  The decedent boater was killed when his boat capsized and he was swept under the rushing waters.

The government moved to dismiss the plaintiff's lawsuit under Rule 12(b)(1), arguing the court had no subject matter jurisdiction due to § 702c immunity.  *Bierer-Carter*, 806 F.Supp.2d at 1249.  After discussing *James* and *Central Green*, the court rejected the plaintiff's argument that immunity did not apply because of the government's failure to provide warning signs and ensure the boat barrier was properly secured, writing:

> "This argument is unavailing.  Both the alleged improper warning signs and the failure to attach the boat barrier directly relate to the dangers of water currents when Structure 68's gates are lifted open. [The plaintiff] cannot circumvent the Flood Control Act's provision of immunity by aiming this lawsuit at the inadequate measures taken by the United States to make Structure 68 reasonably safe.  Under [the plaintiff's] theory that immunity does not apply because of the Corps' failure to warn or other negligent actions, the United States should not have received immunity in *Reese* [*Reese v. South Florida Water Management District*, 59 F.3d 1128 (11th Cir. 1995)] or *James* where the courts discussed the failure of the defendants to adequately warn recreational users of the dangers of the waters."  *Bierer-Carter*, 806 F.Supp.2d at 1251.

Similarly, in the instant case, Plaintiffs cannot defeat Defendant's immunity argument based on their claim that Defendant failed to keep safe or adequately warn about the slippery and dangerous nature of the low water primary boat ramp at Bo Wood on Lake Shelbyville.  See *Bierer-Carter*, 806 F.2d at 1251.

The court found more relevant and persuasive the plaintiff's argument that it was unclear whether the release of flood waters from Structure 68 were related to flood control and, therefore, "that the character and purpose of the released waters were not for flooding and immunity does not attach." *Bierer-Carter*, 806 F.Supp.2d at 1251. The court relied on the declaration of a Corps' employee, which stated that Structure 68's primary purpose was flood control, and that the reason for the water's release on the day in question was for flood control purposes. *Bierer-Carter*, 806 F.Supp.2d at 1252. The court found that, based on the declaration, the water should be characterized as flood water and the purpose of releasing the water was due to flooding. *Bierer-Carter*, 806 F.Supp.2d at 1252. The court noted that: (1) the declaration declared that the lake was at flood stage on the day in question; (2) Structure 68 made flood control releases until the gates were closed, which was after the decedent boater was swept through the structure; and (3) because Structure 68 automatically lifted gates when headwater elevation reached .02' above the variable water control elevation, and such an elevation was reached on the day in question due to rainfall, the lake was at flood stage, and Structure 68 thus automatically opened its gates and released flood waters into the canal. *Bierer-Carter*, 806 F.Supp.2d at 1253. Consequently, the court concluded that the character of the water released from Structure 68 was flood water, which was discharged into the canal for the purpose of regulating the lake's water levels at flood stage and that it was this water that caused the boater decedent's death and therefore § 702c immunity should apply. *Bierer-Carter*, 806 F.Supp.2d at 1253.

Again, in the instant case, based on the declarations of Defendant's employees, the court has determined that the character of the waters that caused Scott's injuries were flood waters,

and that the purpose behind their presence in Lake Shelbyville was to control flooding. See *Central Green*, 531 U.S. at 434; *Bierer-Carter*, 806 F.Supp.2d at 1251. The various declarations in this case have noted that: (1) Lake Shelbyville was at flood stage on the day of Scott's injury (and had been all summer and would be for days after the injury); (2) Lake Shelbyville remained at flood stage because if Defendant were to release too much of the flood water from the lake it would increase the then-existing downstream flooding of the Kaskaskia River and produce significant property damage in those areas; and (3) because of the flood control activity exerted by Defendant, flood waters coated the low water primary boat ramp and deposited slick and slippery substances on the ramp that directly caused Scott's injury. Consequently this court concludes that the character of the water that caused the low water boat ramp to be slick and slippery was flood water, which was retained in the lake for flood control purposes, and that this flood water directly caused Scott's injury and therefore § 702c immunity applies to bar Plaintiffs' cause of action. See *Central Green*, 531 U.S. at 434; *Bierer-Carter*, 806 F.Supp.2d at 1253.

      Having determined that § 702c immunity of the Flood Control Act applies to bar Plaintiffs' negligence claims, the court need not address Defendant's discretionary function argument. Judgment is entered in favor of Defendant and against Plaintiffs on Counts I and II of Plaintiff's Complaint (#1). Because the court has also determined that Defendant's motion for judgment on the pleadings and motion to dismiss for failure to state a valid claim should be granted as to the wanton and willful claims (Counts III and IV of Plaintiffs' Complaint), Defendant's Motion for Summary Judgment (#36) is GRANTED in full. Judgment is entered for Defendant and against Plaintiffs.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion for Summary Judgment (#36) is GRANTED in full.  Judgment is entered for Defendant and against Plaintiffs.

(2) This case is terminated.

ENTERED this 18th day of March, 2014

/s/Harold A. Baker

_____

HAROLD A. BAKER
U.S. DISTRICT JUDGE